Filed 10/24/14  In re R.H. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re R.H., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>K.H.,<br><br>        Defendant and Appellant. | E060800<br><br>(Super.Ct.No. RIJ1301317)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  Donna L. Crandall, Judge.  (Retired judge of the Orange Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed in part; dismissed in part.

Megan Turkat Schirn, under appointment by the Court of Appeal, for Defendant and Appellant.

Gregory P. Priamos, County Counsel, Anna M. Marchand, Deputy County Counsel for Plaintiff and Respondent.

1

The juvenile court found the child of defendant and appellant, K.H. (Mother), R.H., came within the court's jurisdiction. (Welf. & Inst. Code, § 300, subd. (b).) Mother contends the court's finding that R.H. was at risk at the time of the jurisdiction hearing is not supported by substantial evidence. Mother also contends the trial court's removal order is not supported by substantial evidence. We affirm in part, and dismiss in part.

## FACTUAL AND PROCEDURAL HISTORY

A.    BACKGROUND

R.H. was female and was born in 2010. The identity of R.H.'s Father was unknown; Mother was uncertain who he may be. Mother had two adult sons, B.H. and A.H. In 2013, B.H. was 25 years old and A.H. was 19 years old. Both sons resided in Mother's home.

B.    DETENTION

On November 27, 2013, at approximately 8:00 p.m., an anonymous person observed a car driving erratically near a Walgreen's drug store in Calimesa. The anonymous person contacted law enforcement. Riverside County Sheriff's Deputy Corderio went to the area and found a car matching the description of the reported vehicle parked in the Walgreen's parking lot. As the deputy approached the car, he saw B.H. sitting in the driver's seat, Mother in the passenger seat, and R.H. in a car seat.

The deputy asked Mother and B.H. for identification. Mother and B.H. "exhibited serious muscular coordination problems" and "were barely able to respond to [the deputy's] questions because of their slurred speech, and information processing

2

problems." Mother's eyes were bloodshot, her upper body swayed side to side when she exited the vehicle, and she lost her balance and almost fell several times when walking a distance of 10 feet. The deputy asked who had been driving the vehicle, and each claimed the other had been driving. The deputy arrested Mother and B.H. for public intoxication. The deputy contacted the Riverside County Department of Public Social Services (the Department) in regard to R.H.

The deputy informed the Department social worker that the deputy had contact with Mother two weeks prior. During that prior contact, Mother reported "a cache of prescription drugs, including Soma, Norco, and Ativan had been stolen from her car." Mother said she needed a police report in order to immediately replace the drugs. The report appeared "dubious" to the deputy.

The Department contacted Mother's other son, A.H., who suggested the social worker contact his maternal grandparents (Grandparents), who reside in Calimesa. Grandparents requested R.H. be placed with them. They also informed the social worker that the grandmother (Grandmother) was disabled and required around the clock care and supervision. Mother cared for Grandmother five days per week, while the grandfather (Grandfather) was at work.

Additionally, Grandparents said they were "concerned about [Mother's] use of prescription drugs and this problem has been present for at least the past ten years." Grandparents explained that Mother's husband committed suicide 10 years prior, Mother had "unresolved grief and mental health problems" due to the suicide. Grandparents acknowledged a psychiatric assessment, psychiatric treatment, and drug

3

rehabilitation would be appropriate for Mother upon her release from jail. Grandparents "were relieved that [Mother] might finally get the help she needs."

On November 27, at approximately 11:45 p.m., Mother contacted the Department social worker asking about R.H. Mother's "speech was very slurred," and Mother had difficulty understanding the conversation. The social worker suggested the conversation be delayed until Mother "had sobered up, but [Mother] adamantly denied being under the influence of a controlled substance."

The social worker transported R.H. to a foster home. After arriving at the foster home, the social worker discovered four bottles of prescription medication in R.H.'s diaper bag. Three of the prescriptions were in B.H.'s name and included Soma, Vicodin, and an anxiety medication. The fourth prescription was in Mother's name and was an anxiety medication.

The following day, November 28, Mother explained that she suffered from a disc problem in her neck and fibroid tumors. Mother said she had been prescribed: (1) Soma, which is a muscle relaxer, (2) Norco, which is a pain medication, (3) Xanax, which is an anxiety medication, and (4) Omeprizole, which is an acid reflux medication. Mother said that the day before, on November 27, she was "experiencing an anniversary reaction" to her husband's suicide, and therefore decided to take two extra Soma pills to help with alleviating the day's stress. Mother said "she had no idea that overdosing on Soma would have such an effect upon her." Based upon Mother's speech pattern, it appeared to the social worker that Mother was still under the influence of Soma.

Mother and her children have been the subject of three prior reports to the Department. In September 2010, when R.H. was born, it was reported that Mother suffered mental health problems and was a victim of domestic violence. Mother said she had received a "mental health diagnosis" following her husband's suicide, but was not taking her prescription medication due to being pregnant. Mother said "her family has a long history of depression," and she would take her medication if needed. The allegations were "determined to be [u]nfounded."

In November 2006, it was reported that B.H. and Mother were obtaining Vicodin illegally and sharing the drug with one another. Mother was taking Hydrocodone for her neck pain, and showed the social worker her prescription. B.H. had suffered a torn knee ligament and had been "taking Hydrocodone off and on for the past two years" due to the pain. Mother denied obtaining drugs illegally and denied sharing drugs with B.H. The "referral was closed as [u]nfounded."

In September 2003, the Department received a report reflecting Mother had been hospitalized "at least 3 times in the last year" and was "on major 'heavy duty medications.'" The report further alleged Mother was giving 14-year-old B.H. her prescription drugs, which caused B.H. to be "so high" that he missed school. The reporting party believed B.H. and A.H. were left alone while Mother was hospitalized.

A social worker investigated. B.H. and A.H. were "poorly groomed." The home smelled of pet urine. B.H. denied abusing drugs and said he missed school due to difficulties with other students. Mother admitted she was bipolar and manic depressive. Mother said she was "on many medications" and felt the medicines were helpful.

5

Mother was receiving medical services, but no therapy. Mother explained that Grandmother cared for B.H. and A.H. while Mother was hospitalized. The Department concluded Mother's mental health issues were being addressed, but suggested she attend therapy. The "allegations were determined to be [u]nfounded."

As to the instant case, the Department filed a petition alleging (1) on November 27, Mother was arrested for public intoxication while R.H. was in her care, and four bottles of prescription medication were found in R.H.'s diaper bag; (2) Mother had a history of abusing controlled substances and was currently abusing prescription drugs while caring for R.H.; and (3) Mother suffered from mental health issues, she failed to seek appropriate treatment for her mental health issues, and she recently took two extra Soma pills (a muscle relaxer) to cope with her grief concerning her husband's suicide. (Welf. & Inst Code, § 300, subd. (b).)[1]

The juvenile court found a prima facie case had been established reflecting R.H. came within section 300, subdivision (b). The court ordered R.H. be detained. The court found placing R.H. in Mother custody would present a substantial danger to R.H.'s health. The court found removing R.H. from the home was necessary.

C.    JURISDICTION AND DISPOSITION

On December 11, 2013, R.H. was placed in Grandparents' home. Mother spent five days at a "detox center," beginning December 9. When interviewed by the Department social worker, Mother said, "'When my husband killed himself, I started

---

[1] All subsequent statutory references will be to the Welfare and Institutions Code, unless otherwise indicated.

6

taking the Soma to numb it." Mother explained, "'I was abusing the Soma, because I was really depressed, and I learned that the Soma numbs you, so you just learn to take it so it doesn't hurt as bad." Mother said she abused prescription medication approximately three to four days per week.

Mother said she did not abuse medications while pregnant with R.H. However, after giving birth to R.H., she took Soma and Norco "to assist with the pain." Mother said her use of prescription medications converts to abuse "during 'certain months or dates,' and increased 'around the holidays,' which she reported as being emotionally 'painful.'" Mother said she last abused prescription medication on December 8, 2013, which is the day before Mother entered an inpatient treatment program. Mother told the social worker, "'I'm not going to lie, I knew I was coming here, so I just took a bunch of pills the day before.'"

As of December 27, Mother was still participating in an inpatient substance abuse treatment program. Mother's medications were monitored by her counselor. On December 10 and 15, Mother tested "positive for Benzo[diazepines]." Mother's first negative drug test occurred December 24.

The Department social worker asked Mother about her plans after the inpatient program. Mother explained that she would return to her house and live with her sons. The social worker asked if B.H. was also seeking treatment for drug abuse. Mother said B.H. "'just quit'" after R.H. was removed from the home; he was not receiving treatment. The social worker expressed concerned that Mother would return to living with B.H., since he did not receive treatment and it was unknown if he was still abusing

7

drugs.  Mother offered to live with Grandparents.  Mother denied having mental health issues.

Mother requested R.H. be placed with her at the recovery center, which permits children to be placed with mothers.  On "several occasions," Mother told her counselor at the treatment center that she wanted to leave the inpatient treatment center to care for her two sons.  The counselor was concerned about who was caring for Mother's children.  Mother then explained her sons were adults.  The Department expressed concern that if R.H. were placed with Mother at the treatment center, then Mother "may abscond with the child."

Mother submitted a brief to the court prior to the jurisdiction and disposition hearing.  Mother explained that she understood her adult sons would need to move out of her home before R.H. could be returned to Mother's physical custody.  Mother asserted her son or sons would not be allowed in her home until he/they sought treatment.  However, Mother also presented a plan where she would be residing with Grandparents, while her sons stayed in her home.  Mother asserted she was willing to take prescribed medication for any mental illness she may have.  Additionally, Mother noted she did not abuse drugs while pregnant, she did not have a criminal history, and she and R.H. were closely bonded.

In regard to detainment, Mother asserted R.H. would not be in danger if placed with Mother at the treatment center.  Mother asserted her treatment program was "intensive" and designed to accommodate R.H.  Mother described the program as "a safe, secure 'gated haven'" for herself and R.H.  Mother contended she did not

understand the Department's concern that she would abscond with R.H. Mother asserted the Department did not appear to appreciate Mother had support and services at the treatment center.

At a hearing on January 10, 2014, the juvenile court continued the jurisdiction and disposition matters, but authorized (1) liberal visitation, including overnight and weekend visits; and (2) Mother to reside at Grandparents' home, where R.H. was residing, after Mother's release from the inpatient program, with the condition Mother not be left alone with R.H.

On January 28, 2014, Mother completed the inpatient program and moved into Grandparents' home. Mother participated in an aftercare program. Mother attended weekly meetings and tested negative for drugs. Mother had been contacted to schedule a therapy appointment, but a week later had not yet done so. The Department social worker reminded Mother that therapy would help her deal with her grief issues. B.H. had not obtained substance abuse treatment, but was willing to enter a program once he obtained Medi-Cal coverage; B.H. had not yet applied for Medi-Cal coverage.

The Department social worker spoke to Mother. Mother said that she and Grandfather were "contemplating several housing options." The options included (1) Mother and R.H. residing with Grandparents at Grandparents' home; (2) Mother, R.H. and A.H. residing at Mother's home, while B.H. resided with Grandparents; and (3) Mother, R.H., A.H., and B.H. residing together at Mother's home. Mother asserted this third arrangement would only occur if B.H. obtained substance abuse treatment.

9

At the jurisdiction hearing on March 6, Mother's attorney argued that the court should not take jurisdiction because Mother did not pose a current risk to R.H. Mother's attorney asserted the detention was "a good wake up call for [Mother], but everything is going well now."

The Department argued R.H. "could have died" during the Walgreen's driving incident if law enforcement had not intervened. The Department asserted Mother had been abusing prescription medications for 10 years, and a 90-day period of sobriety was "very good," but Mother still needed monitoring. The Department contended Mother was "close" to being on family maintenance, as opposed to receiving reunification services. However, the Department was arguing for removal and family reunification services because B.H. was still residing in Mother's home. The Department was worried about Mother possibly returning to the home when B.H. had not received treatment for his substance abuse issues. The Department requested the court order removal and family reunification services until "they can sort out whether mom clearly intends to return to the family home with [B.H.] or whether [B.H.] is going to move out of the home so that mother and [R.H.] can return to that home."

R.H.'s attorney joined in the Department's arguments. R.H.'s attorney commended Mother for her progress but noted "it really is a recent history of sobriety compared to a long history of use."

The juvenile court commented that R.H. was three years old and "doesn't know when to call for help." The court also found "a three-month history of recovery versus a 10-year history of abuse is not quite enough to say that it's all fixed. It just doesn't get

10

fixed that fast." The court said Mother had been doing "everything right," but needed to "sort out" her living situation, so that it would be clear she would not live with B.H. while he was lacking treatment for substance abuse problems. The juvenile court found true the three allegations against Mother and sustained the petition. The court ordered R.H. removed from Mother's physical custody, but authorized liberal visitation including overnight and weekend visits. The court also authorized the Department to return R.H. to Mother's physical custody, providing Mother made R.H. available to the Department upon request.

#### D.    SIX-MONTH REVIEW

The juvenile court held the six-month review hearing in this case on September 8.[2] At the hearing, the court found the issues justifying the need for jurisdiction had been resolved. The juvenile court returned R.H. to Mother's physical custody and terminated the dependency petition.

### DISCUSSION

#### A.    MOOTNESS

At the outset, we raise and address the issue of mootness. "As a general rule, an order terminating juvenile court jurisdiction renders an appeal from a previous order in the dependency proceedings moot. [Citation.] However, dismissal for mootness in

---

[2] On our own motion, we take judicial notice of the Riverside County Superior Court's September 8, 2014, minute order in case No. RIJ1301317. (Evid. Code, § 452, subd. (d).)

11

such circumstances is not automatic, but 'must be decided on a case-by-case basis.' [Citations.]" (*In re C.C.* (2009) 172 Cal.App.4th 1481, 1488.)

Arguably, the issues in this case are moot because there are no further proceedings pending related to this case. (See *In re C.C.*, *supra*, 172 Cal.App.4th at p. 1488 ["'An issue is not moot if the purported error infects the outcome of subsequent proceedings'"].) For example, there is not a second child whose case may be affected by the jurisdiction findings in this case. Also, we would be speculating if we assumed the jurisdiction findings in the instant case might affect a future dependency case involving Mother. Nevertheless, out of an abundance of caution, we will address the merits of Mother's contentions related to the juvenile court's jurisdiction findings, since they could perhaps affect a future proceeding. (See *id.* at p. 1489 ["dismissal of the appeal operates as an affirmance of the underlying judgment or order"].)

B.     SUBSTANTIAL EVIDENCE

Mother contends the juvenile court erred in finding Mother's behavior posed a substantial risk of harm to R.H. Mother contends she was already participating in a drug treatment program when the risk finding was made, so the court erred by finding Mother posed a risk to R.H.

"'On appeal, the "substantial evidence" test is the appropriate standard of review for both the jurisdictional and dispositional findings. [Citation.] The term "substantial evidence" means such relevant evidence as a reasonable mind would accept as adequate to support a conclusion; it is evidence which is reasonable in nature, credible, and of solid value. [Citation.]' [Citation.] 'In making this determination, all conflicts are to

12

be resolved in favor of the prevailing party, and issues of fact and credibility are questions for the trier of fact. [Citation.] In dependency proceedings, a trial court's determination will not be disturbed unless it exceeds the bounds of reason. [Citation.]' [Citation.]" (*In re A.B.* (2014) 225 Cal.App.4th 1358, 1363.)

Three elements must be satisfied when finding a child comes within the juvenile court's jurisdiction: "(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) 'serious physical harm or illness' to the minor, or a 'substantial risk' of such harm or illness." (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 820.)

In regard to the element of risk, the question that must be answered "is whether circumstances *at the time of the hearing* subject the minor to the defined risk of harm. [Citation.] Thus the past infliction of physical harm by a caretaker, standing alone, does not establish a substantial risk of physical harm; '[t]here must be some reason to believe the acts may continue in the future.' [Citations.]" (*In re Rocco M.*, *supra*, 1 Cal.App.4th at p. 824, fn. omitted.)

The evidence reflects Mother had been abusing prescription drugs for approximately a decade. Grandparents said Mother had unresolved grief issues for 10 years, and had a prescription drug problem for 10 years. In 2013, Mother admitted using a muscle relaxer to deal with her feelings associated with her husband's suicide. Therefore, there is evidence of a decade long drug habit.

At the time of the jurisdiction hearing, on March 6, 2014, Mother had been sober for approximately two and one-half months, since her first clean drug test occurred on December 24, 2013. Thus, the evidence reflects Mother's sobriety was brief in

comparison to her years of drug abuse. In regard to Mother's arrest, the evidence reflected R.H. had been in the car while it was being driven erratically, which shows R.H. was placed at risk by Mother's drug abuse. Additionally, on December 27, Mother "denied having mental health concerns," and in March 2014, Mother had not yet scheduled a therapy appointment. Mother said her drug abuse was caused by trying to numb the stress and depression she felt related to her husband's suicide. This evidence reflects there was a significant risk of Mother relapsing into drug abuse since she was not addressing the root cause of her drug habit.

Based upon the foregoing evidence, the juvenile court could reasonably find Mother posed a risk to R.H. because Mother had been sober for a very short time (two and one-half months) when compared to her decade long drug habit. The juvenile court could reasonably conclude that, since Mother was not addressing her stress and depression issues in therapy, Mother would relapse into using drugs to cope with her emotions. Mother's drug use would then place R.H. at substantial risk, possibly through another driving incident or neglect. In sum, substantial evidence supports the trial court's finding that circumstances at the time of the jurisdiction hearing exposed R.H. to a substantial risk of harm.

Mother asserts the evidence is insufficient because the Department alleged a single incident of intoxication and Mother was in treatment by the time the jurisdiction hearing occurred. The Department presented three separate factual allegations. The Department presented the parking lot public intoxication as one allegation; the second allegation concerned Mother's history of abusing controlled substances and her current

14

use of prescription medication; and the third allegation addressed Mother's mental health issues, her reliance on Soma to cope with her mental health issues, and her lack of treatment for her mental health issues.

Mother asserts the allegations, when considered individually, do not support a finding that R.H. was placed at risk of harm. Mother does not explain why the juvenile court was required to evaluate the risk of harm in isolation for each allegation. The law provides that when a court is evaluating the risk to a child, the court should consider "all surrounding circumstances." (*In re J.N.* (2010) 181 Cal.App.4th 1010, 1025.) In the instant case, if the primary act of harm was R.H. being in the car while Mother and B.H. were intoxicated, then the "surrounding circumstances" include (1) the circumstance that Mother has a decade long drug habit; and (2) the circumstances that Mother suffers from mental health problems, the mental health problems have gone untreated, and the mental health problems are the cause of Mother's drug abuse. Accordingly, the evidence related to all three factual allegations was relevant in evaluating the risk of harm to R.H. The court did not need to consider the factual allegations in isolation.

Moreover, we note the dependency pleading requirements are broad in nature. Section 332, subdivision (f), requires that a petition contain "[a] concise statement of facts, separately stated, to support the conclusion that the child upon whose behalf the petition is being brought is a person within the definition of each of the sections and subdivisions under which the proceedings are being instituted." There is nothing in the subdivision indicating that the facts are isolated allegations that may not be jointly considered.

15

C.      ABUSING CONTROLLED SUBSTANCES AND MENTAL HEALTH

In Mother's appellant's opening brief, under a separate heading, Mother contends substantial evidence does not support the juvenile court's risk findings on two of the allegations: (1) Mother has a history of abusing controlled substances and is currently abusing prescription medication; and (2) Mother suffers from mental health issues, she took two extra muscle relaxers in an attempt to cope with the grief surrounding the anniversary of her husband's suicide, and she fails to seek appropriate treatment for her mental health issues. Specifically, Mother asserts there is no evidence that her past behavior placed R.H. "at risk of suffering physical harm."

We have explained *ante*, that the juvenile court properly found a risk of harm based upon evidence of (1) Mother's decade long drug habit; (2) her untreated mental health issues, which Mother blamed for causing the drug habit; and (3) R.H. being in the car while Mother and B.H. were intoxicated and while the car was being driven erratically. Accordingly, we will not repeat that analysis here.

D.      FAMILY MAINTENANCE

Mother contends the juvenile court's disposition order removing R.H. from Mother's physical custody was not supported by substantial evidence. Mother asserts R.H. should have been placed in Mother's physical custody on a plan of family maintenance. Since R.H. has been returned to Mother's physical custody, and the dependency petition has been terminated, we conclude this issue is moot. There is no further relief we can offer Mother because R.H. is in Mother's physical custody. (*In re A.B.*, *supra*, 225 Cal.App.4th at p. 1364 ["'When no effective relief can be granted, an

16

appeal is moot'"].)  Accordingly, we will dismiss as moot the disposition portion of the appeal.

## DISPOSITION

The jurisdiction order is affirmed.  The portion of the appeal concerning the disposition order is dismissed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
J.

We concur:

HOLLENHORST
Acting P. J.

KING
J.